1  J. DAVID BREEMER, No. 215039
   Email: JBreemer@pacificlegal.org
2  Pacific Legal Foundation
   555 Capitol Mall, Suite 1290
3  Sacramento, California 95814
   Telephone: (916) 419-7111
4  Facsimile: (916) 419-7747

5  Attorney for Plaintiff Daniel Knight

6

7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  DANIEL KNIGHT,                          No. 3:22-cv-06347-WHO

12                           Plaintiff,     **(RENEWED) MOTION FOR**
                                            **PRELIMINARY INJUNCTION AND**
13          v.                              **MEMORANDUM IN SUPPORT**

14  RICHARDSON BAY REGIONAL AGENCY,         Date:    January 4, 2023
    et al.,                                 Time:    2:00 p.m.
15                                          Courtroom:   2 (via videoconference)
                             Defendants.    Judge:   Hon. William H. Orrick
16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ......................................................................................................... 1

FACTS AND PROCEDURE .......................................................................................... 2

    A.   Background .................................................................................................. 2

    B.   Knight and His Boat .................................................................................. 3

    C.   The RBRA Buyback Program and Seizure Order ...................................... 4

        1.   The Buyback Offer ............................................................................. 5

        2.   The Seizure Order .............................................................................. 6

        3.   Prior Proceedings ............................................................................... 6

STANDARD OF REVIEW ............................................................................................ 7

ARGUMENT ................................................................................................................ 7

I.     KNIGHT'S BOAT DOES NOT QUALIFY AS "MARINE DEBRIS" ............... 8

II.    KNIGHT IS LIKELY TO PREVAIL ON HIS CLAIMS THAT THE
        SEIZURE ORDER VIOLATES THE FOURTH AMENDMENT,
        THE TAKINGS CLAUSE, SUBSTANTIVE DUE PROCESS
        PROTECTIONS, AND STATE PROCEDURAL DUE PROCESS RULES ................... 10

    A.   Knight Will Prevail on His Fourth Amendment Claim ............................. 10

        1.   The Order Caused a "Seizure" ......................................................... 10

        2.   The Boat Seizure Is Unreasonable ................................................... 11

    B.   Knight Will Prevail on His Takings Clause Claim ................................... 13

        1.   Background Takings Law .................................................................. 13

        2.   The Order Effects an Unconstitutional Taking ................................. 14

        3.   An Injunction Is a Proper Remedy for Knight's Takings Claim ....... 15

    C.   Knight Will Prevail on His Substantive Due Process Claim ..................... 16

    D.   Knight Will Prevail on His California Constitution Due Process Claim ........ 18

III.   KNIGHT WILL SUFFER IRREPARABLE HARM AND
        THE EQUITIES SUPPORT AN INJUNCTION ................................................ 19

CONCLUSION ............................................................................................................ 20

# TABLE OF AUTHORITIES

## Cases

*Aitken v. City of Aberdeen*,
　393 F. Supp. 3d 1075 (W.D. Wash 2019) ............................................................. 19

*Alliance for Wild Rockies v. Cottrell*,
　632 F.3d 1127 (9th Cir. 2011) ............................................................. 7, 17, 20

*Am. Beverage Ass'n v. City & Cnty. of San Francisco*,
　916 F.3d 749 (9th Cir. 2019) ............................................................. 7–8

*Archer v. Gipson*,
　108 F. Supp. 3d 895 (E.D. Cal. 2015) ............................................................. 11

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*,
　950 F.2d 1401 (9th Cir. 1991) ............................................................. 19

*Beaudreau v. Superior Court*,
　535 P.2d 713 (Cal. 1975) ............................................................. 18

*Boddie v. Connecticut*,
　401 U.S. 371 (1971) ............................................................. 18

*California v. Azar*,
　911 F.3d 558 (9th Cir. 2018) ............................................................. 7

*Cedar Point Nursery v. Hassid*,
　141 S. Ct. 2063 (2021) ............................................................. 13

*Citicorp Servs., Inc. v. Gillespie*,
　712 F. Supp. 749 (N.D. Cal. 1989) ............................................................. 19

*City of Ladue v. Gilleo*,
　512 U.S. 43 (1994) ............................................................. 16

*Cleveland Bd. of Educ. v. Loudermill*,
　470 U.S. 532 (1985) ............................................................. 18

*County of Sacramento v. Lewis*,
　523 U.S. 833 (1998) ............................................................. 16

*Frost v. Railroad Comm'n of Cal.*,
　271 U.S. 583 (1926) ............................................................. 14

*Garcia v. City of Los Angeles*,
　11 F.4th 1113 (9th Cir 2021) ............................................................. 10, 12

*Garfinkle v. Superior Court*,
　578 P.2d 925 (Cal. 1978) ............................................................. 18

*Goldie's Bookstore v. Superior Court*,
　739 F.2d 466 (9th Cir. 1984) ............................................................. 19

*Hernandez v. County of Monterey,*
   110 F. Supp. 3d 929 (N.D. Cal. 2015) ............................................................ 19–20

*Horne v. Dep't of Agric.,*
   576 U.S. 350 (2015) ................................................................................... 13, 16

*Johnson v. Macy,*
   145 F. Supp. 3d 907 (C.D. Cal. 2015) .......................................................... 15–16

*Johnson v. Outboard Marine Corp.,*
   172 F.3d 531 (8th Cir. 1999) ......................................................................... 11

*Kash Enters., Inc. v. Los Angeles,*
   562 P.2d 1302 (Cal. 1977) ............................................................................ 18

*Kincaid v. City of Fresno,*
   No. 1:06-cv-1445 OWW SMS, 2006 WL 3542732 (E.D. Cal. Dec. 8, 2006)....................... 10

*Knick v. Twp. of Scott,*
   139 S. Ct. 2162 (2019) ............................................................................ 13–14

*Koontz v. St. Johns River Water Mgmt. Dist.,*
   570 U.S. 595 (2013) ..................................................................................... 14

*Lavan v. City of Los Angeles,*
   693 F.3d 1022 (9th Cir. 2012) ............................................................ 10–12, 17–19

*Lenz v. Winburn,*
   51 F.3d 1540 (11th Cir. 1995) ........................................................................ 11

*Lingle v. Chevron U.S.A. Inc.,*
   544 U.S. 528 (2005) ..................................................................................... 13

*Loretto v. Teleprompter Manhattan CATV Corp.,*
   458 U.S. 419 (1982) ..................................................................................... 13

*Martin v. City of Boise,*
   920 F.3d 584 (9th Cir. 2019) .......................................................................... 14

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ........................................................................... 8

*Menefee & Son v. Dep't of Food & Agriculture,*
   199 Cal. App. 3d 774 (1988) ........................................................................... 18

*Mitchell v. U.S. Dep't of Housing & Urban Dev.,*
   569 F. Supp. 701 (N.D. Cal. 1983) ................................................................... 19

*Moore v. City of East Cleveland,*
   431 U.S. 494 (1977) ..................................................................................... 16

*Mullane v. Central Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) ..................................................................................... 18

*Nunez v. City of Los Angeles,*
   147 F.3d 867 (9th Cir. 1998) .......................................................................................... 16–17

*Palko v. Connecticut,*
   302 U.S. 319 (1937) ............................................................................................................. 16

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust,*
   636 F.3d 1150 (9th Cir. 2011) ............................................................................................. 19

*Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust,*
   252 Fed. Appx. 152 (9th Cir. 2007) ................................................................................... 16

*Park Village Apartments Tenants Ass'n v. Mortimer Howard Trust,*
   No. C 06-7389 SBA, 2007 WL 519038 (N.D. Cal. Feb. 14, 2007) ................................. 15–16

*Payton v. New York,*
   445 U.S. 573 (1980) ..................................................................................................... 16–17

*Pottinger v. City of Miami,*
   810 F. Supp. 1551 (S.D. Fla. 1992) ............................................................................. 15, 19

*Proctor v. District of Columbia,*
   No. 1:18-cv-00701 (TNM), 2018 WL 6181739 (D.D.C. Nov. 27, 2018) ............................ 12

*Regan v. Taxation With Representation of Wash.,*
   461 U.S. 540 (1983) ............................................................................................................. 14

*Rios v. County of Sacramento,*
   562 F. Supp. 3d 999 (E.D. Cal. 2021) ............................................................................... 18

*Sausalito/Marin County Chapter of California Homeless Union v. City of Sausalito,*
   522 F. Supp. 3d 648 (N.D. Cal. 2021) ................................................................................. 2

*Severance v. Patterson,*
   566 F.3d 490 (5th Cir. 2009) ........................................................................................ 11–12

*Silverman v. United States,*
   365 U.S. 505 (1961) ............................................................................................................. 17

*Skelly v. State Personnel Bd.,*
   539 P.2d 774 (Cal. 1975) ..................................................................................................... 18

*Soldal v. Cook County,*
   506 U.S. 56 (1992) ....................................................................................................... 10, 17

*Sullivan v. City of Berkeley,*
   No. C 17-06051 WHA, 2018 WL 489011 (N.D. Cal. Jan. 19, 2018) .................................. 12

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,*
   535 U.S. 302 (2002) ...................................................................................................... 13–14

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision,*
   967 F.2d 598 (D.C. Cir. 1992) ........................................................................................... 15

*U.S. WeChat Users Alliance v. Trump*,
     488 F. Supp. 3d 912 (N.D. Cal. 2020) ...................................................................... 7

*United States v. Jacobsen*,
     466 U.S. 109 (1984) ............................................................................................ 10, 12

*United States v. Piner*,
     608 F.2d 358 (9th Cir. 1979) ...................................................................................... 11

*United States v. Salerno*,
     481 U.S. 739 (1987) ............................................................................................ 16–17

*Washington Legal Found. v. Legal Found. of Washington*,
     271 F.3d 835 (9th Cir 2001) ........................................................................................ 15

*Washington v. Glucksberg*,
     521 U.S. 702 (1997) ...................................................................................................... 16

*Winter v. Natural Res. Def. Council, Inc.*,
     555 U.S. 7 (2008) ............................................................................................................ 7

## U.S. Constitution

U.S. Const. amend. V ................................................................................................................ 13

Cal. Const. art. I, § 7 ................................................................................................................ 18

## Statutes

Cal. Harb. & Nav. Code § 550 ............................................................................................ 8, 11

Cal. Harb. & Nav. Code § 551 ....................................................................................... 8–9, 11

Cal. Harb. & Nav. Code § 551(a)(1)(A) ............................................................................. 8–9

## Regulation

33 C.F.R. § 110.126a .................................................................................................................. 2

## Rule

Fed. R. Civ. P. 65 ........................................................................................................................ 1

**INTRODUCTION**

Pursuant to Federal Rule of Civil Procedure Rule 65, Plaintiff Daniel Knight (Knight) hereby moves the Court to issue a preliminary injunction halting enforcement of a Richardson Bay Regional Agency (RBRA) order that seizes and takes Knight's boat and his home in violation of the federal and state constitutions. This motion rests on the declarations and exhibits concurrently filed with this memorandum, as well as the declarations and exhibits previously filed with this Court as part of Knight's Motion for a Temporary Restraining Order. *See* ECF No. 3.

Daniel Knight, a retired truck driver, has lived on a boat in Richardson Bay (Bay) since 1999—longer than the RBRA has been in existence. He lives in a fully operational, 35-foot "Coronado" sailboat, which he bought for $6,000. Knight's boat has electricity, a fully functional hot water system and shower, and a working engine and sail system. He lives and sleeps on the boat, conducts personal business from there, and sails it from time to time. *See* Exhibit A (Second Declaration of Daniel Knight), ¶¶ 3–10, 12; Exhibit B (photos); Exhibit C (photos of inside of boat).

The RBRA is, however, displeased with boaters like Knight, as it believes the combined effect of boat anchors in the Bay may harm "eel grass" that lies on the Bay floor. The RBRA has entered into an agreement with the San Francisco Bay Conservation and Development Commission (BCDC) to remove boats like Knight's by 2026. *See* Exhibit D (BCDC Agreement). As part of this removal effort, the RBRA created a boat buy-back program that would allow boaters like Knight to sell their vessels to the RBRA for $150 per foot so the agency could dispose of them. *See* Exhibit E (Buyback program material).

In Summer of 2022, the RBRA wanted Knight to join this program. But Knight refused because a condition of Knight's Buyback contract was that he would forfeit payment for the boat if he became homeless in nearby cities after selling—a certainty in his case since the boat is his only home. *See* Exhibit F (Buyback contract). After Knight refused to sell his boat, the RBRA posted a notice on his boat stating that it would be removed and disposed of as "marine debris" in 10 days. Exhibit K (notice and order). Knight has nowhere to store the boat, no home other than the boat, no boat trailer, nor any financial means. *See* Exhibit A, ¶¶ 26–36. The RBRA has already demonstrated the intent, ability, and willingness to engage in boat removal enforcement actions

1   even when it makes the owner-occupant homeless and destitute, *Sausalito/Marin County Chapter*
2   *of California Homeless Union v. City of Sausalito*, 522 F. Supp. 3d 648, 651 (N.D. Cal. 2021)
3   (summarizing evidence of people being forced into homeless camps due to RBRA's boat
4   enforcement actions). Enforcement of the removal order against Knight will leave him in that very
5   state. This is irreparable harm.

6        Knight should not suffer such harm, however, because the order is unconstitutional and
7   invalid. The boat is not "marine debris." But in any case, the order amounts to an unreasonable
8   seizure of Knight's boat, in violation of the Fourth Amendment, because the order was issued
9   without a prior hearing or reasonable compensation guarantee and includes an unreasonable 10-day
10  compliance deadline. The order also creates an unconstitutional taking of Knight's property, on the
11  facts of this case, because it will take his boat and home without just compensation. Further, since
12  the boat does not qualify as "marine debris," the RBRA never had authority to issue the seizure
13  order, and doing so was not due process of "law." Finally, the order violates the California
14  Constitution's due process guarantee because it was issued without adequate notice or hearing.
15  Knight is likely to prevail on all of these claims. Since the equities also support a preliminary
16  injunction in this case, the Court should issue one.

17                        **FACTS AND PROCEDUR**E

18   **A.  Background**

19        Richardson Bay (Bay) is a small bay that flows into the larger San Francisco Bay waters.
20  The Bay lies within Marin County and is surrounded by communities such as Sausalito, Mill
21  Valley, and Tiburon, California. A potential refuge in the often chaotic northern Pacific coastal
22  environment, the Bay's waters have attracted boaters for centuries and is a federally designated
23  anchorage area. *See* 33 C.F.R. § 110.126a. Indeed, for many decades, at least since the World War II
24  era, people have lived on boats in the Bay. *See* Exhibit G (*San Francisco Chronicle* article with
25  1952 photos and history).

26        In the year 2000, four cities that surround the Bay entered into a "joint powers agreement"
27  (JPA) for the purpose of managing the Bay. *See* Exhibit H. The JPA created a regional local
28  government agency called the Richardson Bay Regional Agency, and then delegated to the agency

the participating cities' powers to regulate the Bay. The RBRA is run by a board of directors who represent the participating cities and a small staff that includes executive director Steven McGrath and Harbor Master Jim Malcom (Harbor Master Malcom).

### B. Knight and His Boat

Daniel Knight, a United States citizen, owns and lives on a boat anchored in Richardson Bay. As a 65-year old, retired truck driver, Knight lives on a small, fixed income. Knight suffers from certain medically diagnosed health conditions, including a staphylococcus infection, which is currently latent in his skin, and arthritis, which worsens in cold weather. Both require shelter and sanitation. *See* Exhibit A, ¶¶ 2–6.

Knight arrived and initially anchored in the Bay in approximately 1999, prior to the creation of the RBRA. He has lived on a boat in the Bay continuously since then and lives on the boat that is the subject of this dispute. *See* Exhibit A, ¶¶ 6–8, *see also* Exhibit C (photos of living area within boat). Knight does not own any other residence or have access to any other residence in the Bay area. He does not hold a marina berth lease and could not afford a berth even if one were available. He does not have family in the area. Exhibit A, ¶¶ 7–8, 32.

Knight's boat is a 35 foot "Coronado" sailboat, which he bought for $6,000. Exhibit A, ¶ 9. This boat has a working diesel motor engine, a completely rigged, functional sail system, enclosed helm, and operational wheel for navigation. The boat has a new, tankless water heater for hot water and showers. It has a generator and electricity, and a bed. Knight and others have periodically sailed and operated Knight's boat, under its own power, since he acquired it. *Id.* ¶¶ 10–12. On November 2, 2022, Knight safely sailed the boat on the Bay. *See* Exhibit I (Declaration of Shannon Satterfield); Exhibit J (photos taken 11/2/2022).

In October 2021, a powerful "mini-typhoon" storm impacted the Bay, and damaged many boats. Knight's boat was one of the impacted vessels. The storm moved the boat off its anchorage, beached it, moderately damaged a small part of the hull, and washed mud into the vessel. However, the storm did not seriously harm the sails, engine, and other critical parts. The boat was still operable after the storm. *See* Exhibit A, ¶¶ 13–15.

///

Knight believes the storm damaged the boat because someone removed his anchorage system about two weeks prior to the storm. He was thus forced to use a substitute system during the storm, which likely contributed to the storm's ability to move the boat off its anchorage. Knight believes that Harbor Master Malcom (or his agents) took his original anchorage system, while Knight was sailing his boat, because he later saw the missing anchor system lying in the Harbor Master's boat storage yard. *Id.* ¶¶ 15–16.

After the storm, Knight was forced to temporarily live in a County homeless camp while he worked to repair his boat. While he was not on the boat as much as in the past during this time, he still regularly visited it, in preparation for reoccupying it when repairs were complete. Knight paid about $1,000 for repairs to the boat, primarily to patch a small breach in the hull. In early 2022, he moved back onto the boat full-time. Knight is often gone from the boat during daylight hours, but returns to sleep there at night. Exhibit A, ¶¶ 13–18.

After repairing the boat, Knight did not sail much as in the past because he feared that RBRA agents would again take his anchorage system while he was sailing and off the anchorage. *Id.* ¶¶ 17–19. Nevertheless, Knight continued to use the boat for transportation on a number of occasions in 2022, including in the summer and, more recently, in November 2022. On November 2, 2022, Knight sailed the boat with a friend, and it left and returned under its own power without problems. *See* Exhibit A, ¶¶ 20–21, 39; *see also* Exhibit I (Satterfield Declaration); Exhibit J (photos taken 11/2/2022).

**C.  The RBRA Buyback Program and Seizure Order**

On or around August 2019, the RBRA reached an agreement ("BCDC Agreement") with Defendant San Francisco Bay Conservation and Development Commission (BCDC) to remove many anchored vessels from Richardson Bay by October 2026. A main goal of the Agreement is to protect "eel grass" on the floor of the Bay from anchor damage by removing boats. *See* Exhibit D (BCDC Agreement).

The Agreement states that "all illegally anchored vessels on Richardson Bay that arrive after August 2019 will be removed along with their ground tackle no later than October 15, 2023." Exhibit D (BCDC Agreement) at 5. The Agreement further states that "[a]ll illegally anchored

vessels present on the anchorage before August 2019 will be removed from the anchorage no later than October 15, 2026." *Id.* According to this timeline: (a) all unoccupied "marine debris" vessels would be removed by October 15, 2021; (b) "[o]ccupied vessels that failed to enroll in the Safe and Seaworthy Program shall be subject to immediate removal with their ground tackle/moorings and . . . shall be removed no later than October 15, 2024;" (c) "occupied vessels that enroll[ ] in the Safe and Seaworthy Program and are maintained in a seaworthy condition shall be removed no later than October 15, 2026." *Id.* at 5–6.

### 1. The Buyback Offer

In June 2022, the RBRA adopted a Vessel Buyback program to facilitate the removal of boats from Richardson Bay in accordance with the BCDC Agreement. The program offers eligible participants the opportunity to sell boats anchored in Richardson Bay for $150 per foot so that the RBRA can remove vessels from an "Eelgrass Protection Zone (EPZ)" and other parts of Richardson Bay. *See* Exhibit F (Buy Back Program Payment Conditions)

After adoption of the Buyback program, Harbor Master Malcom contacted Knight about potentially selling his boat through the program. Knight was initially interested because he felt threatened by the RBRA's planned removal of boats like his under the Agreement. The RBRA sent him a contract that offered him $5,250 to sell his boat for removal under the Buyback program. *See* Exhibit F (Knight Buyback contract).

Knight ultimately opted not to execute the Buyback contract for several reasons. First, when Knight read the proposed Buyback contract, he learned that one of the conditions was that he could not become homeless in the adjacent cities of Sausalito, San Rafael, or Navato after he was paid for the boat under the Buyback program. *See* Exhibit F. Condition number 3 of the Buyback contract states that a vessel owner selling a boat under the Buyback Program agrees to "[n]o new overnight presence by the vessel owners or occupants in any encampment or other outdoor area in the City of Sausalito, San Rafael, or Navato." *Id.* The "Payment Conditions" page of the Buyback contract then states: "Any failure to abide by [the] conditions prior to 6 months from first payment will result in failure to receive final 20% payment, as well as legal proceedings to recoup funds already distributed for buy back." *Id.* The contract further states: "Any failure to follow these

conditions after 100% of funds have been distributed will result in legal proceedings to recoup all funds previously distributed." *Id.*

Since Knight has no other residence other than the boat, selling the boat under the program would mean he would immediately become homeless. Exhibit A, ¶¶ 32–33. But the moment that happened, the Buyback contract made clear that Knight would forfeit the boat Buyback payment. Therefore, participating in the program would mean Knight would be left with no boat, no home, and no money under the Buyback program. Moreover, Knight's boat is worth more that the $5,250 offered through the Buyback program. *Id.* ¶ 34. Therefore, on October 10, 2022, Knight sent a letter to the Harbor Master stating that he objected to the terms of the Buyback and would not participate at this time. *Id.* ¶ 35.

### 2. The Seizure Order

A few days later, on or about October 14, 2022, Knight found a notice attached to his boat entitled "Ten Day Notice to Remove Marine Debris." *See* Exhibit K (Notice and order).[1] The notice stated that his boat would be "removed and disposed" of as "marine debris" within 10 days (by October 24, 2022), unless Knight left the Bay. Knight did not receive any administrative hearing or other opportunity to contest the "marine debris" classification for his boat or the removal/disposal order before its issuance, nor did the order itself offer any hearing opportunity. Knight was not offered compensation by the RBRA if his boat was removed as "marine debris" and the order did not offer any.

### D. Prior Proceedings

On October 21, 2022, Knight filed a complaint in this Court, raising multiple claims against the RBRA, its officers, the BCDC, and other defendants, under the Constitution, 42 U.S.C. § 1983, and other statutory provisions. The complaint sought both equitable relief and damages. *See* ECF No. 1. He also concurrently filed a motion for a temporary restraining order (TRO) and a preliminary injunction. ECF No. 3.

---

[1] The RBRA may have previously posted a "marine debris" notice on Knight's boat in 2021. The agency voluntarily withdrew that notice afterward and Knight did not file suit at that time. Therefore, any such prior notice or order is not at issue here.

This Court held a hearing on the motion for a TRO on October 27, 2022. Afterward, the Court granted a TRO. ECF No. 11. In so doing, the Court set a briefing and hearing schedule for a motion for preliminary injunction. The order directed the parties to address several issues in their preliminary injunction memoranda, including: "whether the RBRA may exercise authority over vessels in Richardson Bay; whether the *Coronado* qualifies as marine debris; whether Knight lives on the boat; what form of compensation was offered and/or rejected and why; other questions raised by this order; and, any other pertinent information." ECF No. 12 at 13.

## STANDARD OF REVIEW

A district court may grant preliminary injunctive relief if the moving party shows: (1) a substantial likelihood of success on the merits; (2) that irreparable harm is likely in the absence of relief; (3) the balance of equities favors the movant; and (4) the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The balance of equities and public interest factors merge where, as here, the government is a party. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). One seeking a preliminary injunction need not prove that they will certainly prevail on their claims but only that the claims raise "serious questions." *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).

## ARGUMENT

This motion is based on Knight's federal constitutional claims under the Fourth Amendment, Takings Clause, substantive protections of the Due Process Clause, and the state Due Process Clause in Article I, Section 7 of the California Constitution. Knight is likely to prevail on all of these claims because it is unreasonable, illegitimate, procedurally impermissible and unconstitutional to order removal of his boat (and home) as "marine debris" on 10-days notice, without a prior hearing or guarantee of reasonable compensation. Further, Knight will suffer irreparable harm without a preliminary injunction as the removal of his boat would instantly make him homeless and endanger his health and life. Finally, the balance of equities/public interest consideration favors Knight because an injunction maintains the status quo, *U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912, 929 (N.D. Cal. 2020), and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Am. Beverage Ass'n v. City & Cnty. of*

1    *San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (quoting *Melendres v. Arpaio*, 695 F.3d 990,

2    1002 (9th Cir. 2012)).

3                                              **I.**

4              **KNIGHT'S BOAT DOES NOT QUALIFY AS "MARINE DEBRIS"**

5              Although the question of whether Knight's boat is "marine debris" within the meaning of

6    state law is likely to arise as a subsidiary issue in some of Knight's constitutional claims, it is useful

7    to address the issue at the outset since the "marine debris" classification is at the core of the RBRA's

8    action, and this Court specifically asked for briefing on the question. To be clear, Knight's right to

9    a preliminary injunction does not hinge on resolution of the "marine debris" issue because, whether

10   it is "debris" or not (it is not), the boat is still private property that is constitutionally protected from

11   unconstitutional removal. Nevertheless, the reality is that Knight's boat cannot be considered

12   "marine debris."

13             Cal. Harb. & Nav. Code § 550 defines "marine debris" as follows:

14             (b) "Marine debris" is a vessel or part of a vessel, including a derelict, wreck, hulk,
             or part of any ship or other watercraft or dilapidated vessel, that is *unseaworthy and*
15           *not reasonably fit or capable of being made fit to be used as a means of*
             *transportation by water.*

16

17   *Id.* (emphasis added).

18             Cal. Harb. & Nav. Code § 551 includes additional criteria for removing vessels that qualify

19   as "marine debris" under the prior provision. It states, in relevant part:

20           (a) (1) Notwithstanding any other law, marine debris that is floating, sunk, partially
             sunk, or beached in or on a public waterway, public beach, or on state tidelands or
21           submerged lands may be removed and destroyed, or otherwise disposed of, by any
             state, county, city, or other public agency having jurisdiction over its location or
22           having authority to remove marine debris or solid waste, subject to the following
             conditions:
23
             (A) The object meets the definition of marine debris in subdivision (b) of Section
24           550 *and has no value or a value that does not exceed the cost of removal and*
             *disposal.*
25
             (B) If there is no discernible registration, hull identification number, or other
26           identification insignia, a peace officer or authorized public employee securely
             attaches to the marine debris a notice stating that the marine debris shall be removed
27           by the public agency if not claimed or removed within 10 days.

28

(C) If there is discernible registration, hull identification number, or other identification insignia, a notice is attached to the marine debris as described in subparagraph (B), and sent to the owner of the marine debris, if known, at the owner's address of record with the Department of Motor Vehicles, by certified or first-class mail.

(D) The marine debris remains in place for 10 days from the date of attaching the notice to the marine debris or from the date the notice letter was sent, whichever is later, before being removed.

(2) (A) The notice attached to the marine debris shall state the name, address, and telephone number of the public agency providing the notice.

(B) A notice sent to the owner shall contain the information specified in subparagraph (A), and further state that the marine debris will be removed and disposed of within 10 days if not claimed, and that the marine debris may be claimed and recovered upon the payment of the public agency's costs.

(Emphasis added.)

Therefore, as the foregoing provisions show, a vessel can be treated as "marine debris" under California law only if it is (1) "unseaworthy" *and* (2) lacks value, or least has such little value that it is worth less than the cost of removal and disposal. Knight's boat meets neither of the criteria. First, the evidence shows that Knight regularly uses the boat for water transportation, including on November 2, 2022. *See* Exhibit A, ¶ 39; Exhibit I (Dec. of Satterfield); Exhibit J (photos of Nov. 2, 2022, boat trip). A vessel that is actually used on the water without problems is certainly "seaworthy." The RBRA does not and cannot dispute that the vessel has (1) working sails, (2) a working engine, and (3) that the boat sailed and operated on the water under its own power. Exhibit A, ¶¶ 10–11. This is sufficient to conclude that Knight is likely to prevail on his assertion that the boat is not "marine debris," and that RBRA lacks authority to order his boat removed as such.

Even if there were doubt on whether the boat is "marine debris," the RBRA cannot prevail on the second criterion for the permissible removal of "marine debris;" namely, that the vessel lacks meaningful monetary value. Cal. Harb. & Nav. Code § 551 makes clear that "marine debris" may be removed as such only if the subject vessel also has negligible value. *See* § 551(a)(1)(A) (removal permissible if marine debris "has no value or a value that does not exceed the cost of removal and disposal"). It is the RBRA's burden to make this evidentiary showing since it is the entity invoking the authority of § 551(a)(1)(A). But it cannot do so. Indeed, the RBRA's own Buyback offer of $5,250 for Knight's boat and the purchase price of $6,000 demonstrate that his boat has significant

1   value. Exhibit A, ¶¶ 9, 29. This precludes the agency from satisfying the "no value" element of the

2   "marine debris removal" process under Harb. & Nav. Code § 551. Therefore, Knight is likely to

3   prevail on the issue of whether the RBRA has authority to remove the boat as "marine debris." It

4   does not.

5                                                       **II.**

6   **KNIGHT IS LIKELY TO PREVAIL ON HIS CLAIMS THAT THE SEIZURE ORDER**
    **VIOLATES THE FOURTH AMENDMENT, THE TAKINGS CLAUSE, SUBSTANTIVE**
7   **DUE PROCESS PROTECTIONS, AND STATE PROCEDURAL DUE PROCESS RULES**

8       **A.      Knight Will Prevail on His Fourth Amendment Claim**

9           Knight asserts that the RBRA's boat seizure order effects an unreasonable and

10  unconstitutional seizure of his boat. The Fourth Amendment protects personal property from

11  unreasonable seizures in the civil, as well as criminal, context. *Soldal v. Cook County*, 506 U.S. 56,

12  66–67 (1992). To establish an unreasonable seizure, one must show that (1) a protected property

13  interest (2) has been seized, *id.* at 61; (3) in an unreasonable manner. *Lavan v. City of Los Angeles*,

14  693 F.3d 1022, 1027 (9th Cir. 2012); *Garcia v. City of Los Angeles*, 11 F.4th 1113 (9th Cir 2021);

15  *Kincaid v. City of Fresno*, No. 1:06-cv-1445 OWW SMS, 2006 WL 3542732, at *35–36 (E.D. Cal.

16  Dec. 8, 2006).

17          **1.   The Order Caused a "Seizure"**

18          A "seizure" for purpose of Fourth Amendment review occurs when "there is some

19  meaningful interference with an individual's possessory interests in that property." *Soldal*, 506 U.S.

20  at 63 (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Here, Knight's boat is personal

21  private property. The removal and disposal of the boat under the Order would plainly interfere with

22  Knight's possessory interest in the vessel, and "disposal" would permanently terminate that interest.

23          Indeed, even if the RBRA could legitimately treat Knight's boat as "marine debris" (it

24  cannot), the removal Order still effects a seizure subject to Fourth Amendment scrutiny. After all,

25  whether "marine debris" or not, Kight has an important possessory and property interest in the boat,

26  ///

27  ///

28  ///

1   which is all that is needed to trigger the protections of the Fourth Amendment.[2] *Lavan*, 693 F.3d at

2   1032; *Lenz v. Winburn*, 51 F.3d 1540, 1549 n.10 (11th Cir. 1995) ("[A] possessory interest is all

3   that is needed for the Fourth Amendment's reasonableness requirement to apply to a seizure.").

4   Similarly, even if Knight did not live on his boat (he does), his boat is still property that is subject

5   to, and protected by, the Constitution, including the Fourth Amendment. *Johnson v. Outboard*

6   *Marine Corp.*, 172 F.3d 531, 536 (8th Cir. 1999); *United States v. Piner*, 608 F.2d 358, 361 (9th

7   Cir. 1979). The "simple rule" that the government may not seize property "like a thief in the night"

8   holds true "regardless of whether the property in question is an Escalade or an EDAR, a Cadillac

9   or a [homeless] cart," or here, a sailboat. *Lavan*, 693 F.3d at 1032.

10          **2.   The Boat Seizure Is Unreasonable**

11          The boat seizure authorized by the Order is unreasonable for several reasons. First, because

12   Knight's boat does not qualify as "marine debris" under Cal. Harb. & Nav. Code §§ 550–551, the

13   seizure order is unauthorized by California law, and an unauthorized seizure is by definition

14   "unreasonable." *See Severance v. Patterson*, 566 F.3d 490, 502 (5th Cir. 2009) (property owner

15   stated an unreasonable seizure claim because the owner alleged the interference with her property

16   was "*unjustified by state law* or, if justified, then uncompensated") (emphasis added).

17          But even if the RBRA had state law authority to remove the boat as "marine debris," doing

18   so in this case would still be an unreasonable seizure because there has been no prior hearing

19   opportunity for Knight to contest the order or the RBRA's interference with his possessory interest

20   in his boat. If he had had such an opportunity, Knight could have shown that the order was

21   unreasonable and unwarranted in his case because the boat is seaworthy, and because of the severe

22   impact of seizure on his life, and his economic and health status.

23          Furthermore, the 10-day notice of the boat seizure is unreasonable in this case. Ten days'

24   notice is not a reasonable period for a person to remove all personal belongings from a long-

25   occupied vessel, find a new place to live, seek a safe and affordable storage area for the boat, or to

26

27   [2] Notably, even when government determines that property is a "nuisance," which has not happened here with respect to Knight's boat, the Fourth Amendment applies and prohibits the government from unreasonably seizing the property. *Archer v. Gipson*, 108 F. Supp. 3d 895, 911 (E.D. Cal.

28   2015) (finding an unreasonable seizure of construction materials deemed to be a nuisance).

take other necessary steps. *See, e.g.*, *Proctor v. District of Columbia*, No. 1:18-cv-00701 (TNM), 2018 WL 6181739, at *3 (D.D.C. Nov. 27, 2018) (plaintiffs stated valid Fourth Amendment claim based in part on an allegation that the government noticed the wrong date or time of scheduled street clean-ups that resulted in seizure of property); *Sullivan v. City of Berkeley*, No. C 17-06051 WHA, 2018 WL 489011, at *4 (N.D. Cal. Jan. 19, 2018). (Fourth Amendment claims allowed to proceed where the plaintiffs alleged that a city "collect[ed] and store[d] property without notice, and in a way that [did] not allow plaintiffs to retrieve it in a usable condition (or at all)"). We don't expect people to vacate apartments with less than 60 days' notice in California, and here the RBRA provided Knight 10 days. Finally, the seizure order is unreasonable because it was issued without any reasonable compensation guarantee to Knight for the loss of his boat and home. *See Severance*, 566 F.3d at 502 (property owner stated an unreasonable seizure claim because, even state law allowed the interference with her property, it was still "uncompensated").

The RBRA will undoubtedly point out that it offered a Buyback program payment of $5,250 to Knight for his boat. But that offer was not just or *reasonable* compensation because the payment was conditioned on Knight not becoming homeless after receiving payment for the boat, a contingency that was a certainty in this case given that Knight has nowhere to live other than the boat. *See* Exhibit F. Thus, the Buyback program did not provide "just" compensation to Knight, or indeed any compensation at all, because sale of his boat under the program and the resulting homelessness would immediately allow the RBRA to recoup the payment, leaving him with no compensation.

The RBRA may seek to avoid this analysis by arguing that Knight's boat should not be on the Bay in the first place. But this is wrong and besides the point. The Fourth Amendment applies even to property that the government believes is unlawful or improperly located. *Lavan*, 693 F.3d at 1029 ("Violation of a City ordinance does not vitiate the Fourth Amendment's protection of one's property."); *id.* at 1030 ("the Supreme Court has recognized [Fourth Amendment] protected possessory interests even in contraband") (citing *Jacobsen*, 466 U.S. at 124–25); *Garcia*, 11 F.4th at 1118 ("The Fourth Amendment protects individuals from unreasonable government seizures of their property, even when that property is stored in public areas.").

Knight's boat is protected by the Fourth Amendment regardless of the RBRA's characterization of its seaworthiness or location, and because issuance of the seizure Order without adequate notice, hearing or compensation was unreasonable in this case, Knight will prevail on his Fourth Amendment claim.

## B.    Knight Will Prevail on His Takings Clause Claim

Knight is also likely to prevail on his claim that the order amounts to an unconstitutional taking of his property, because his boat is property protected by the Takings Clause, the pending removal of the boat amounts to a *per se* "taking," and the RBRA has not provided compensation for the taking of Knight's boat.

### 1.  Background Takings Law

The Takings Clause of the Fifth Amendment prohibits uncompensated takings of private property. U.S. Const. amend V. A *per se* or "categorical" "taking" occurs when government engages in or authorizes a physical occupation of property. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). Physical occupation of private property is a per se taking, regardless of the purpose, size, or duration of the taking. *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2074 (2021) ("The duration of an appropriation—just like the size of an appropriation—bears only on the amount of compensation.") (citation omitted); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 432 (1982). Invasions of personal property are just as protected from takings under these strict, per se standards as invasions of real property. *Horne v. Dep't of Agric.*, 576 U.S. 350, 360–61 (2015) (holding that confiscation of raisins is subject to the same strict per se takings tests as a taking of land).

The most obvious example of a per se, physical taking is when the government takes possession of property for its own purposes. *See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (A taking occurs "[w]hen the government physically takes possession of an interest in property . . . regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof.") (citation omitted). When the government physically possesses private property, its action is automatically unconstitutional unless it provides just compensation to the affected property owner at the time of the taking. *Knick v. Twp. of Scott*,

139 S. Ct. 2162, 2172–73 (2019). Notably, takings claims are justiciable and remediable in federal court without regard to the existence of overlapping state court remedies. *Id.*

### 2. The Order Effects an Unconstitutional Taking

Here, the order states that the RBRA "shall" remove and dispose of Knight's boat in 10 days. Exhibit K. The agency thus intends to take physical possession of Knight's boat—a quintessential taking. *Tahoe-Sierra Pres. Council*, 535 U.S. at 322.

This taking is unconstitutional because the RBRA has not offered or guaranteed just compensation to Knight for the boat. Again, the agency may argue that the taking is compensated because Knight could get paid through the Buyback program. But the boat payment available through that program is inadequate, unjust, and, ultimately, an illusion, because it is conditioned on the requirement that Knight refrain from becoming homeless in surrounding cities after any sale of his boat through the program. *See* Exhibit F. This condition is likely in itself an unconstitutional condition because it requires the waiver of a legal right—the right to live without a home, if forced to[3]—as a condition of the benefits of the Buyback program. *See generally*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013) ("the government may not deny a benefit to a person because he exercises a constitutional right") (quoting *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 545 (1983)); *Frost v. Railroad Comm'n of Cal.*, 271 U.S. 583, 592–93 (1926) (invalidating a regulation that required the petitioner to give up a constitutional right "as a condition precedent to the enjoyment of a privilege").

But regardless, in this case, the "no homelessness" condition imposed on the Buyback program is impossible for Knight to satisfy because his boat is his only home. The condition thus ensures he will not be compensated. Obtaining "compensation" by selling the boat in the Buyback program would instantly make homeless and leave him without any living options except a nearby homeless camp. Exhibit A, ¶¶ 32–33, which would result in forfeiture of a Buyback payment. The Buyback payment (the alleged compensation for a taking of the boat) is thus self-negating in Knight's case. As soon as Knight obtained it by selling the boat, he would forfeit it by becoming

---

[3] *See Martin v. City of Boise*, 920 F.3d 584, 616 (9th Cir. 2019) (Constitution forbids criminal penalties against living outside).

homeless and living outside. Moreover, the $5,250 payment offered through the Buyback program is less than the amount Knight paid for the boat. Exhibit A, ¶ 9. The Buyback payment program accordingly does not provide "just" compensation. Therefore, the RBRA's plan to take the boat qualifies as an unconstitutional taking. *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1570 n.30 (S.D. Fla. 1992) ("The court further finds that the City's seizure and destruction of plaintiffs' personal property violate the fifth amendment, which prohibits the taking of private property for public use without just compensation.").

The RBRA may argue that Knight can avoid a taking altogether by voluntarily removing his boat from the Bay. But this is not a solution in this case because Knight has plausibly demonstrated that he has nowhere to go, nor means to move or store the boat. Exhibit A, ¶ 32. He does not own a home, boat trailer, or marina berth and has limited resources. *Id.* While voluntary boat removal may be feasible in another situation, it is not here. For Knight, the seizure order is a guarantee that the RBRA will take the boat within 10 days. Since this will occur without just compensation, it is unconstitutional.

### 3.  An Injunction Is a Proper Remedy for Knight's Takings Claim

Finally, the RBRA may question whether an injunction is the proper remedy for the uncompensated taking of the boat. It is. While monetary compensation may be the optimal remedy in many takings cases, an injunction is proper when damages are inadequate to remedy a taking. *Washington Legal Found. v. Legal Found. of Washington*, 271 F.3d 835, 849–50 (9th Cir 2001) (citing *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 613 (D.C. Cir. 1992) ("the district court should accept jurisdiction over takings claims for injunctive relief in the few cases where a Claims Court [damages] remedy is 'so inadequate that the plaintiff would not be justly compensated'")).

Damages for the loss of Knight's boat are not an adequate remedy in this case. Again, Knight's boat is not just a means of transportation; it is a home. The seizure order is thus effectively an eviction order, and eviction is "not an injury for which remedies available at law are adequate." *Johnson v. Macy*, 145 F. Supp. 3d 907, 920 (C.D. Cal. 2015); *see also*, *Park Village Apartments* ///

1   *Tenants Ass'n v. Mortimer Howard Trust*, No. C 06-7389 SBA, 2007 WL 519038, at *8 (N.D. Cal.

2   2007), *aff'd*, 252 Fed. Appx. 152 (9th Cir. 2007) (citing eviction injunction cases).

3        Moreover, even if otherwise theoretically adequate, a damages remedy would not remedy

4   the taking here. This is because takings damages only provide "fair market value" for the property

5   that is taken. *Horne*, 576 U.S. at 368–70. Here, Knight's boat has value beyond its mere economic

6   value as a vessel due to its function as his residence. Thus, even if damages were adequate as a

7   matter of law in an eviction-type takings case (they are not), *Johnson*, 145 F. Supp. 3d at 907, they

8   would remain inadequate here due to the fact that compensating fair market value for the boat will

9   not make Knight whole.

10       **C.      Knight Will Prevail on His Substantive Due Process Claim**

11       Knight has also raised a claim against the seizure order under the Fourteenth Amendment's

12  Due Process Clause. In certain circumstances, that clause provides substantive protections against

13  "deprivations of property" "without due process of law." Among those circumstances are cases

14  where the government deprives a person of life, liberty, or property in a way that "interferes with

15  rights implicit in the concept of ordered liberty" or "shocks the conscience." *Nunez v. City of Los

16  Angeles*, 147 F.3d 867, 871 (9th Cir. 1998) (quoting *United States v. Salerno*, 481 U.S. 739, 746

17  (1987)). A threshold requirement is that the claimant must show he has been deprived of a right

18  "rooted in this Nation's history and tradition," and "implicit in the concept of ordered liberty."

19  *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Moore v. City of East Cleveland*,

20  431 U.S. 494, 503 (1977), *Palko v. Connecticut*, 302 U.S. 319, 325 (1937)). When this standard is

21  met, the issue revolves around whether a challenged deprivation arbitrarily interferes with the

22  protected private interest or is "conscience-shocking." *Glucksberg*, 521 U.S. at 769 (Souter, J.,

23  concurring); *County of Sacramento v. Lewis*, 523 U.S. 833, 847–48 (1998).

24       Here, this case implicates fundamental rights rooted in this nation's tradition of "ordered

25  liberty." Most importantly, the deprivation of Knight's boat interferes with the basic right to live

26  peaceably in the privacy of a home. The Supreme Court has long recognized that this interest enjoys

27  special constitutional protection. *City of Ladue v. Gilleo*, 512 U.S. 43, 58 (1994) ("A special respect

28  for individual liberty in the home has long been part of our culture and our law[.]"); *Payton v. New*

1  *York*, 445 U.S. 573, 596–97 (1980) (stating, in a Fourth amendment case, that "[t]he zealous and

2  frequent repetition of the adage that a 'man's house is his castle,' made it abundantly clear that both

3  in England and in the Colonies 'the freedom of one's house'" was vital to liberty) (footnote

4  omitted); *Soldal*, 506 U.S. at 61 (stating that at the "very core" of the Fourth Amendment "stands

5  the right of a man to retreat into his own home") (quoting *Silverman v. United States*, 365 U.S. 505,

6  511 (1961)).

7  　　　The order challenged here injures Knight's fundamental right to live free from arbitrary

8  interference in his home. Indeed, in this case, Knight's protected interest in his home is intertwined

9  with other important private interests, such as his ability to maintain his health. Exhibit A, ¶ 5.

10  Knight needs and uses his boat/home to take care of his medical needs, which include frequent

11  showers for his skin, and shelter from the cold to minimize arthritis. Since Knight's right to enjoy

12  the safety and protection of his home implicates deeply rooted and longstanding life, liberty, and

13  property interests, the RBRA's act of taking the boat and depriving Knight of his home "interferes

14  with rights implicit in the concept of ordered liberty." *Nunez*, 147 F.3d at 871 (quoting *Salerno*,

15  481 U.S. at 746).

16  　　　Moreover, the RBRA's interference with Knight's boat is arbitrary because the agency lacks

17  authority to seize Knight's home as "marine debris." As discussed above, the boat is seaworthy and

18  cannot be legitimately treated as "marine debris" under California law. *See* Exhibit I (photos of

19  Nov. 2, 2022 boat trip). As a result, the RBRA lacks power to deprive Knight of his boat home,

20  which renders the seizure order arbitrary. An unauthorized, arbitrary decision is not "law," and is

21  thus not consistent with "due process of law." Ultimately, the sudden, arbitrary interference with

22  Knight's boat and home is conscience shocking, as it will force a medically challenged, 65-year-

23  old man onto the streets in the wintertime. *Lavan*, 693 F.3d at 1032 ("The City's decision to forego

24  any process before permanently depriving Appellees of protected property interests is especially

25  troubling given the vulnerability of [] homeless residents[.]"). Knight is accordingly likely to

26  prevail on his substantive due process claim, or has at least raised "serious questions" on the merits,

27  which is sufficient to justify a preliminary injunction. *Alliance for Wild Rockies*, 632 F.3d at 1131–

28  35.

1   **D.      Knight Will Prevail on His California Constitution Due Process Claim**

2          The California Constitution, Article I, Section 7, provides: "A person may not be deprived

3   of life, liberty, or property without due process of law . . . ." For most purposes, California's Due

4   Process Guarantee is construed consistently with its federal counterpart. *Garfinkle v. Superior*

5   *Court*, 578 P.2d 925 (Cal. 1978). Like the federal due process guarantee, the state "Constitution

6   requires some form of notice and a hearing." *Kash Enters., Inc. v. Los Angeles*, 562 P.2d 1302,

7   1310 (Cal. 1977) (quoting *Beaudreau v. Superior Court*, 535 P.2d 713, 719 (Cal. 1975)). Indeed,

8   "[n]ormally notice and an opportunity for a hearing must precede even a temporary deprivation of

9   a property interest." *Menefee & Son v. Dep't of Food & Agriculture*, 199 Cal. App. 3d 774, 781

10  (1988) (citing *Skelly v. State Personnel Bd.*, 539 P.2d 774, 788–90 (Cal. 1975)).

11         In this case, of course, the RBRA gave Knight no opportunity to be heard before it ordered

12  his boat removed and disposed of. This alone creates a meritorious due process claim. *Cleveland*

13  *Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("We have described 'the root requirement'

14  of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before*

15  he is deprived of any significant property interest.'") (quoting *Boddie v. Connecticut*, 401 U.S. 371,

16  379 (1971)) (emphasis in original); *Lavan*, 693 F.3d at 1032–33; *Rios v. County of Sacramento*,

17  562 F. Supp. 3d 999, 1024 (E.D. Cal. 2021) (California due process claim stated for taking of

18  homeless person's property without adequate prior notice or hearing).

19         The 10-day notice which the RBRA gave for removal of Knight's boat is also

20  constitutionally inadequate for the taking of a vessel that serves as a home. Notice "must afford a

21  reasonable time" for the affected property owner to address the issue. *Mullane v. Central Hanover*

22  *Bank & Trust Co.*, 339 U.S. 306, 314 (1950), and a 10 day seizure deadline is not reasonable in this

23  case, given Knight's economic and living status. *Id.* at 313 (A deprivation must "be preceded by

24  notice and opportunity for hearing *appropriate to the nature of the case*.") (emphasis added).

25         In sum, Knight is likely to prevail on his Fourth Amendment, Takings Clause, substantive

26  due process, and state constitutional procedural due process claim or has, at the least, raised serious

27  questions as to the merits of his claims. The first preliminary injunction factor weighs in favor of

28  granting an injunction.

## II.

### KNIGHT WILL SUFFER IRREPARABLE HARM
### AND THE EQUITIES SUPPORT AN INJUNCTION

Knight has also shown that he will suffer "irreparable harm" without a preliminary injunction. In the Ninth Circuit, "[a]n alleged constitutional infringement will often alone constitute irreparable harm." *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) (quoting *Goldie's Bookstore v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984)); *see also Citicorp Servs., Inc. v. Gillespie*, 712 F. Supp. 749, 753 (N.D. Cal. 1989) ("In various cases, courts in the Ninth Circuit have presumed irreparable harm from an alleged violation of constitutional rights."). Here, Knight has shown a likelihood of multiple constitutional violations.

Moreover, the loss of one's home is considered "irreparable harm." *Park Village Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011); *Mitchell v. U.S. Dep't of Housing & Urban Dev.*, 569 F. Supp. 701, 705 (N.D. Cal. 1983); *Aitken v. City of Aberdeen*, 393 F. Supp. 3d 1075, 1085–86 (W.D. Wash 2019). Here, if the seizure order is not enjoined, Knight's home will be taken and gone, and he will be homeless with serious medical conditions. This is significant, irreparable hardship. Indeed, Knight's boat represents and contains almost all of his worldly assets and possessions. Even if the boat was not his home (it is), its seizure would cause him severe personal injury. *Lavan*, 693 F.3d at 1032 ("For many of us, the loss of our personal effects may pose a minor inconvenience. However, the loss can be devastating for the homeless.") (quoting *Pottinger*, 810 F. Supp. at 1559).

On the other side of the coin, the issuance of an injunction will not appreciably harm the defendants, as it simply maintains the status quo. An injunction will not invalidate the RBRA's regulatory programs or plans for the Bay; it will simply stop the unconstitutional taking of Knight's boat as "marine debris." Certainly, the hardships faced by Knight—losing one's only real asset and home and being left to sleep on the street with serious health issues—significantly outweighs the RBRA's unsubstantiated belief that his boat (which is only one of many on the Bay) may make some small contribution to the allegedly deleterious effect of boat anchors on sea grass if it stays longer than 10 days. Furthermore, it is always equitable and "in the public interest to prevent the

violation of a party's constitutional rights." *Hernandez v. County of Monterey*, 110 F. Supp. 3d 929, 958 (N.D. Cal. 2015) (citation omitted). Therefore, Knight has satisfied the final criteria for issuance of a preliminary injunction. *Alliance for Wild Rockies*, 632 F.3d at 1131–32 (a preliminary injunction warranted when "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met").

## CONCLUSION

The Court should grant a preliminary injunction enjoining the RBRA and its officials from enforcing the "marine debris" boat removal Order against Knight and his boat.

DATED: November 22, 2022.

Respectfully submitted,

/s/ J. David Breemer
J. DAVID BREEMER

Attorney for Plaintiff Daniel Knight