# Exhibit A

1  J. DAVID BREEMER, No. 215039
   Email: JBreemer@pacificlegal.org
2  Pacific Legal Foundation
   555 Capitol Mall, Suite 1290
3  Sacramento, California 95814
   Telephone: (916) 419-7111
4  Facsimile: (916) 419-7747

5  Attorney for Plaintiff Daniel Knight

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10 | DANIEL KNIGHT,                    | No. 3:22-cv-06347-WHO
11 |                       Plaintiff,  | **SECOND DECLARATION OF DANIEL KNIGHT IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**
12 |       v.                          |
13 | RICHARDSON BAY REGIONAL AGENCY,   |
   | et al.,                           | Judge: Hon. William H. Orrick
14 |
   |                       Defendants. |

16      I, Daniel Knight, do hereby declare and testify:

17      1.    I have personal knowledge of the following facts and, if called upon to do so, could
18 competently testify to these facts.

19      2.    I am a United States citizen, a resident of Marin County, California, and owner of a
20 boat anchored in Richardson Bay, California.

21      3.    I am a 65-year old, retired truck driver.

22      4.    I live on a small, fixed income.

23      5.    I have recently been diagnosed with staphylococcus infection, with the bacteria
24 apparently latent in my skin. I also suffer from arthritis, which gets worse when I am exposed to
25 cold weather.

26      6.    I own a 35 foot sailboat, anchored in Richardson Bay, on which I live.

27 ///

28 ///

7. I initially anchored in Richardson Bay in approximately 1999, prior to the creation of Defendant Richardson Bay Regional Agency (RBRA).

8. I have lived on a boat in the Bay continuously since I arrived in 1999. I do not own any other residence or have access to any other residence. I do not have a marina berth lease. There is a shortage of available marina berths in the Richardson Bay area and I could not afford a lease even if one came available.

9. My boat is a 35-foot "Coronado" sailboat. I purchased it for $6,000.

10. This boat has a working diesel motor engine, a completely rigged, functional sail system, enclosed helm, and operational wheel for navigation.

11. I and others have periodically sailed and operated the boat for water transportation, under its own power, since I acquired it.

12. The boat has a new, tankless water heater for hot water and showers. It has a generator and electricity. There is a bed in the boat.

13. In October 2021, a powerful "mini-typhoon" storm impacted the Bay, and damaged many boats.

14. My boat was one of the vessels damaged by the storm. The storm moved the boat off its anchorage, beached it, moderately damaged a small part of the hull, and washed mud into the vessel. However, the storm did not seriously harm the sails, engine, and other critical parts of the boat. The boat was still operable after the storm.

15. In my opinion, much of the storm damage happened because someone removed my anchorage system about two weeks prior to the storm. I was thus forced to set up and use a substitute anchor system during the storm, which likely contributed to the storm's impact in moving the boat off its anchorage.

16. I believe that RBRA Harbor Master James Malcom (or his agents) took my original anchorage system, prior to the storm, while my boat was being sailed. I hold this belief because I and others with whom I am acquainted saw my anchor system lying in the Harbor Master's boat storage yard.

///

17. As I took step to repair my boat after the storm, I was forced to live temporarily in the County homeless camp. During this time, I was not on the boat as much as in the past, but I still regularly visited it, worked on it, and planned on permanently reoccupying as soon as repairs were complete.

18. When able, I paid about $1,000 for repairs to the boat, primarily to patch a small breach in the hull. In early 2022, I moved back onto the boat on a full-time basis and have lived and slept there continuously and regularly since then. I am, however, often off the boat during the daytime hours, returning at night.

19. After the 2021 storm events and repairs, I did not sail quite as much as in the past due to fears that RBRA agents would again take my anchorage system while I was out to sea on the boat.

20. Nevertheless, I still sailed and used the boat for transportation on a number of occasions after the storm, including in summer of 2022, and more recently, on November 2, 2022.

21. On November 2, 2022, I sailed the boat with a friend for about two hours. It went out into the Bay and returned under its own power without problems.

22. On or around August 2019, the RBRA reached an agreement ("Agreement") with Defendant San Francisco Bay Conservation and Development Commission (BCDC) to remove many anchored vessels from Richardson Bay by October 2026. The boat removal plan Agreement was primarily intended to protect "eel grass" on the floor of the Bay from anchor damage.

23. The Agreement states that "all illegally anchored vessels on Richardson Bay that arrive after August 2019 will be removed along with their ground tackle no later than October 15, 2023."

24. The Agreement between RBRA and BCDC further states that "[a]ll illegally anchored vessels present on the anchorage before August 2019 will be removed from the anchorage no later than October 15, 2026." According to this timeline: (a) all unoccupied "marine debris" vessels would be removed by October 15, 2021; (b) "[o]ccupied vessels that failed to enroll in the Safe and Seaworthy Program shall be subject to immediate removal with their ground tackle/moorings and . . . shall be removed no later than October 15, 2024"; (c) Occupied vessels

1   that enroll in the Safe and Seaworthy Program and are maintained in a seaworthy condition shall
2   be removed no later than October 15, 2026.

3   25.  In June 2022, the RBRA Board of Directors adopted a Vessel Buyback program to
4   facilitate the removal of boats from Richardson Bay in accordance with the Agreement. The
5   program offers eligible participants the opportunity to sell boats anchored in Richardson Bay for
6   $150 per foot so that the boats can be disposed of and, thus, removed from the "Eelgrass Protection
7   Zone (EPZ)" and other parts of Richardson Bay.

8   26.  After adoption of the Buyback Program, James Malcolm, the Richardson Bay
9   Harbor Master, an official of the RBRA, contacted me about potentially selling my boat through
10  the Buyback Program.

11  27.  I was initially interested in investigating the program because I felt threatened by
12  the RBRA's planned removal of boats like mine under the Agreement.

13  28.  I ultimately opted not to participate at this time for several reasons.

14  29.  When I received the Buyback contract proposed by RBRA, it stated that the RBRA
15  would pay me $5,250 for the boat. But I learned that one of the conditions of the contract was that
16  I could not become homeless in the nearby cities of Sausalito, San Rafael, or Navato after a sale. If
17  I did, the Buyback contract stated that the RBRA would take back any buy-back payment made to
18  me.

19  30.  Condition number 3 of the contract states that a vessel owner selling a boat under
20  the Buyback Program agrees to "[n]o new overnight presence by the vessel owners or occupants in
21  any encampment or other outdoor area in the City of Sausalito, San Rafael, or Navato."

22  31.  The "Payment Conditions" page of the Buyback contract then states: "Any failure
23  to abide by [the] conditions prior to 6 months from first payment will result in failure to receive
24  final 20% payment, as well as legal proceedings to recoup funds already distributed for buy back."
25  The contract further states: "Any failure to follow these conditions after 100% of funds have been
26  distributed will result in legal proceedings to recoup all funds previously distributed."

27  32.  I have nowhere else to live other than on my boat on Richardson Bay. I do not have
28  and cannot afford a marina berth. I do not own a boat trailer. I do not have sufficient income to rent

or own a home in the Bay area, and I have no available family residence in the area. Without the boat anchorage on the Bay, I will immediately become homeless.

33. The conditions portions of the Buyback contract made clear that as soon as I sold the boat and thus became homeless, I would forfeit the boat buy-back payment for failure to comply with the "no homeless" condition in the contract. Therefore, participating in the program would mean I would be left with no boat, no home, and no money under the Buyback Program. I could not and did not agree to that.

34. Further, my boat is, in my opinion, worth more that the $5,250 offered through the Buyback Program. I paid a discount, below fair-market value price of $6,000 for it years ago because the former owner had to move to Alaska. I cannot acquire another boat like the one I own for $5,250 or a price in that range.

35. Therefore, on October 10, 2022, I sent a letter to the Harbor Master that made clear I would not participate in the RBRA's boat Buyback Program at this time.

36. A few days later, on or about October 14, 2022, I found a notice attached to my boat entitled "Ten Day Notice to Remove Marine Debris." The notice stated that my boat would be "removed and disposed" of as "marine debris" within 10 days, by October 24, 2022, unless I left the Bay.

37. I did not receive any administrative hearing or other opportunity to contest the "marine debris" classification for my boat or the removal/disposal order before its issuance.

38. I was not offered just or reasonable compensation if my boat was removed as "marine debris."

39. My boat is not "marine debris." It is seaworthy and has been used for sea travel on numerous recent occasions, including on November 2, 2022. It has significant monetary value. It is kept in a clean condition and serves as my home.

40. Without my boat I will suffer significant hardship. I will have no bed on which to sleep, nor any shower facilities to keep my skin clean from bacteria. I will have no electricity and no ability to charge and use my phone for business and personal matters. As it is almost winter, I will be exposed to cold weather and believe I will be subject to increased arthritis flare-ups.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge. Attested and executed this 11th day of November, 2022, at Richardson Bay, California.

_____
DANIEL KNIGHT