**Exhibit D**

**Agreement between the Richardson's Bay Regional Agency (RBRA) and
the San Francisco Bay Conservation and Development Commission (BCDC)**

This Agreement is made and entered into by and between the San Francisco Bay Conservation and Development Commission (BCDC or Commission) and the Richardson's Bay Regional Agency (RBRA). The parties to this Agreement are referred to herein individually as "Party" and collectively as "Parties."

## Recitals

WHEREAS, the McAteer-Petris Act (Act), Government Code Sections 66600 through 66666, established the San Francisco Bay Conservation and Development Commission as the state agency charged with planning for the long-term use of the Bay; and

WHEREAS, pursuant to the Act, BCDC adopted the San Francisco Bay Plan, which has been amended from time to time consistent with the Act, and which establishes a policy that live-aboard boats should be allowed only in marinas and only if certain other requirements are met; and

WHEREAS, in April of 1984, BCDC, working with a steering committee composed of representatives of the local jurisdictions, finalized the Richardson Bay Special Area Plan to guide actions more precisely in Richardson Bay; and

WHEREAS, the Richardson Bay Special Area Plan includes the following policies regarding residential vessels and floating structures:
(1) Vessels and floating structures used for residential purposes (i.e., houseboats and live-aboards) should be allowed only in recreational or houseboat marina berths when consistent with and in compliance with local codes, Commission policies, and public trust needs;
(2) All anchor-outs should be removed from Richardson Bay; and
(3) A limited number of live-aboards and houseboats should be permitted in existing or new recreational boat marinas provided (a) they are necessarily incidental to the recreational boating use; and (b) they are in compliance with the applicable local government codes, including parking requirements; Bay Commission policies; and policies of the Special Area Plan; and

WHEREAS, despite these policies, anchor-outs, houseboats, and floating homes have remained on Richardson Bay outside of marinas; and

WHEREAS, following adoption of the Richardson Bay Special Area Plan, RBRA was formed in 1985 to locally and jointly manage the waters of Richardson Bay; and

WHEREAS, RBRA was formed as a Joint Powers Agency and is comprised of: County of Marin, City of Mill Valley, Town of Tiburon, and City of Belvedere; and

1

WHEREAS, from time to time beginning with its formation, RBRA has removed vessels from the anchorage, but the number of vessels increased from 98 in 2008 to a high of 215 in 2014 and decreasing after that; and

WHEREAS, on February 21, 2019, the BCDC Enforcement Committee held a policy briefing and discussion on the local efforts to improve the management of vessels moored in Richardson Bay at which there were presentations on the pertinent State law and policies, from RBRA and from California Audubon on the adverse impacts to eelgrass caused by anchor outs; and

WHEREAS, in July 2019, RBRA's Board of Directors adopted Ordinance 19-1 updating anchoring and enforcement requirements for vessels on Richardson Bay; and

WHEREAS, in September and November 2019, the BCDC Enforcement Committee received a second and third briefing on the Richardson Bay matter directing staff to direct RBRA to develop and implement a management plan to address ongoing anchorage management issues; and

WHEREAS, on December 3, 2019, BCDC transmitted a letter to RBRA setting forth actions BCDC staff expected to be undertaken to address the vessels anchored in RBRA waters including: Initiation of all appropriate actions to remove from RBRA waters all marine debris, unoccupied vessels, unregistered vessels, and vessels occupied by persons who are not able to control the vessels during storm events or vessels that are endangering or threatening to endanger others; Preparation of a plan with timelines to transition all other vessels off the water within a reasonable period; Preparation of a plan for how RBRA will address and resolve the damage to natural habitat in Richardson Bay; and Monthly reporting to BCDC on the status of implementing these actions; and

WHEREAS, on June 11, 2020, RBRA's Board of Directors adopted Resolution Number 05-20, A Transition Plan for the Richardson's Bay Regional Agency Anchorage with a vision, goal, principles, and policy direction for the anchorage.  The plan affirms a vision for the bay as a temporary anchorage, while providing a pathway for certain pre-existing eligible vessels that are determined by RBRA to be safe & seaworthy to remain for limited durations of time; and

WHEREAS, in 2020, the BCDC Enforcement Committee received briefings on Richardson Bay. The Committee directed BCDC staff to direct RBRA to implement its anchorage management plan including terms regarding vessel influx management, removal of noncompliant vessels within 5 years, a commitment to cooperate in a regional solution, implementation of eelgrass subtidal habitat restoration and monitoring, ongoing community enrichment and engagement measures, and progress reporting; and

WHEREAS, RBRA retained the environmental consulting firm Coastal Policy Solutions, who with the involvement of stakeholders and other interested parties, drafted an Eelgrass Protection and Management Plan (EPMP); and

WHEREAS, since 2014, RBRA efforts have reduced the number of vessels on Richardson's Bay to 88 as of the date of this Agreement; and

WHEREAS, the parties enter into this Agreement for the sole purpose of setting forth RBRA's and BCDC's agreed-upon next steps for the transition of vessels and environmental efforts on Richardson Bay and does not constitute an admission by RBRA that any of its past acts or omissions were inconsistent with the Bay Plan or the Richardson Bay Special Area Plan, violated the Act or any other law, or otherwise constituted wrongdoing;

NOW, THEREFORE, the RBRA and BCDC do agree as follows:

1. **COVID-19 Pandemic Considerations.** The parties understand that COVID-19 pandemic emergency shelter-in-place restrictions may be in place during this Agreement. RBRA shall not be required to take any action that conflicts with the guidance or orders from federal, state, or local officials. If such guidance or orders prohibit the removal of vessels as required by this Agreement, RBRA may seek extensions of time for vessel removal required in this Agreement.

2. **Richardson Bay Special Area Plan Compliance.** RBRA agrees to comply with and implement the Richardson Bay Special Area Plan (SAP) and the ordinances RBRA has issued pursuant to the SAP, as they may be amended from time to time.

3. **Eelgrass Habitat Protection**. RBRA will finalize its Draft Eelgrass Protection and Management Plan (EPMP) by December 15, 2021, and submit a copy to BCDC. If RBRA selects a boundary for the Eelgrass Protection Zone that is less protective of eelgrass than the alternatives presented in the RBRA's Draft EPMP then BCDC will consider the new boundary and inform RBRA if this Agreement must be amended to prevent the need for further BCDC oversight. Within 60 days of finalizing the EPMP, RBRA shall petition for any federal administrative action necessary to implement the EPMP's anchoring zone and Eelgrass Protection Zone/no-anchoring zone. BCDC agrees to provide letters of support for federal administrative actions consistent with the draft EPMP. RBRA will complete the administrative actions, including updating RBRA's Ordinances for consistency, by December 15, 2023, subject to extensions of time for circumstances beyond its control. Vessels will be removed from the Eelgrass Protection Zone as soon as possible, but moving boats can be done in phases based on consultation with experts selected by RBRA who are well versed in the California Eelgrass Mitigation Policy and its Implementing Guidelines (hereinafter, "CEMP") and its periodic updates. In any event, no vessels will anchor in the Eelgrass Protection Zone after October 15, 2024.

4. **Eelgrass Habitat Restoration.** During 2022, RBRA will initiate active eelgrass restoration studies within the Eelgrass Protection Zone comparing restoration scenarios such as: (1) Passive (no intervention) restoration of scour pits; (2) Restoring the bay bottom grade of scour pits by adding clean dredged sediment without planting eelgrass; (3) Planting

eelgrass in scour pits without first restoring the bay bottom grade of scour pits; and (4) Planting eelgrass in scour pits after restoring the bay bottom grade of scour pits by adding clean dredged sediment. RBRA will report its findings to BCDC.

RBRA will develop a ten-year adaptive management plan for eelgrass restoration in Richardson Bay, and submit a copy to BCDC. RBRA will begin implementing this plan by December 15, 2023. The ten-year adaptive management plan will be consistent with the Bay Plan and the Richardson Bay Special Area Plan; incorporate the best available science on eelgrass habitat restoration & the CEMP and its periodic updates; and the results of RBRA's restoration study scenarios as they are obtained. Restoration work will be done in a phased approach pursuant to the ten-year adaptive management plan. RBRA agrees to pursue grants and other funding to implement the adaptive management plan. RBRA shall implement the ten-year adaptive management plan in a timely manner, notwithstanding any funding shortfalls.

5. **Restoration Collaboration.** BCDC and RBRA agree to collaborate on the reuse of dredged materials from Schoonmaker Point Marina or other local dredging projects for use in eelgrass restoration in Richardson Bay, subject to the Dredged Material Management Office (DMMO) determination that the dredged materials are clean and suitable for this purpose.

6. **Temporary Use of Moorings.** By December 15, 2022, RBRA will install in its anchoring zone (outside of its Eelgrass Protection Zone) approximately 15 to 20 moorings such as those described in RBRA's Ecologically-based Mooring Feasibility Assessment and Planning Study. RBRA will use these moorings temporarily for vessels that relocate from the Eelgrass Protection Zone, vessels that are enrolled in the Safe and Seaworthy program, and other temporary uses as the moorings are installed. RBRA will monitor the moorings to evaluate their effectiveness at protecting subtidal resources and securing vessels. RBRA will report its findings on mooring effectiveness and mooring removal to BCDC. If RBRA wishes to retain these mooring after October 15, 2026, it must apply for and obtain a permit from BCDC. Prior to that date, this Agreement is sufficient authorization for RBRA's installation of these moorings; BCDC agrees that it will not pursue any enforcement action claiming or imposing any further permit or other authorization requirement related to such installation.

7. **Prevention of Future Subtidal Habitat Damage.** RBRA shall prevent future subtidal habitat damage by identifying and undertaking all necessary and proper measures to ensure (1) that no new vessels anchor in the Eelgrass Protection Zone after December 15, 2021; and (2) that only seaworthy vessels, as defined in RBRA's Transition Plan and with standard removable marine anchoring equipment, are allowed to anchor in the anchoring zone after October 15, 2026. If subtidal habitat damage is caused by vessels relocated from the Eelgrass Protection Zone to the anchoring zone before the ten-year adaptive management plan for eelgrass restoration is implemented, RBRA will take necessary measures to halt the damage and restore habitat conditions within a

reasonable timeframe as determined by qualified scientists selected by RBRA. Subtidal habitat damage that occurs after the ten-year adaptive management plan is implemented will be restored pursuant to the provisions of the ten-year adaptive management plan, and/or the Bay Plan and SAP, as applicable.

8. **Housing.** BCDC supports RBRA's efforts to continue to connect vessels' occupants with outreach agencies and organizations for assistance with finding shelter and encourages expansion of shelter and housing opportunities. BCDC commits to considering (1) proposals to increase the percentage of affordable marina slips available for vessels described in this agreement or their occupants for temporary discrete time periods; and (2) minor permit applications to build affordable live-aboard slips at existing Richardson Bay marinas. RBRA will provide quarterly reports to BCDC to include non-confidential information received from outreach agencies, organizations and local entities that RBRA is collaborating with related to shelter and housing opportunities and the status of housing efforts as it relates to removing all vessels described in this agreement and their occupants from Richardson Bay by October 15, 2026.

9. **Management of Vessels Arriving on the Richardson Bay Anchorage After August 2019.** All illegally anchored vessels on Richardson Bay that arrive after August 2019 will be removed along with their ground tackle no later than October 15, 2023. RBRA shall undertake reasonable efforts to prevent continued importation of derelict vessels into Richardson Bay for permanent anchorage. These efforts shall include, if warranted, legal actions against individuals involved in this activity. RBRA shall report these efforts to BCDC on a monthly basis. *As of the date of the signing of this agreement there were approximately 20 vessels in this category.*

10. **Management of Vessels on the Anchorage Before August 2019.** All illegally anchored vessels present on the anchorage before August 2019 will be removed from the anchorage no later than October 15, 2026 as outlined below. *As of the date of the signing of this agreement, there were approximately 68 vessels in this category.*

    a. **Unoccupied Marine Debris and Other Vessels.** All unoccupied marine debris vessels and their ground tackle/moorings will be removed by October 15, 2021.

    b. **Floating Homes.** No later than October 15, 2023, the floating homes located offshore from the Waldo Point Harbor houseboat marina and all associated ground tackle/moorings will be removed from Richardson Bay and either legally disposed of or relocated to a legal berth at an authorized houseboat marina in accordance with all applicable local, state and federal laws.

    c. **Occupied Vessels without Safe and Seaworthy Status.** Occupied vessels that failed to enroll in the Safe and Seaworthy Program shall be subject to immediate removal with their ground tackle/moorings and all vessels shall be removed no later than October 15, 2024.

    d. **Occupied Vessels with Safe and Seaworthy Status.** The occupied vessels that enrolled in the Safe and Seaworthy Program and are maintained in a seaworthy condition shall be removed no later than October 15, 2026. Vessels and their ground tackle/moorings enrolled in the Safe and Seaworthy Program that are not maintained in a seaworthy condition shall be subject to immediate removal.

11. **Ground Tackle/Moorings.** Removal of ground tackle/moorings will be consistent with the CEMP and its periodic updates, as well as area-specific research as to what ground tackle will be removed, when it will be removed, and how it will be removed.

12. **Extensions of Time for Vessel Removal.**  The RBRA and BCDC agree that so long as the overall rate of vessel removal remains consistent with the rate specified in this agreement, RBRA may elect, after consultation and approval from BCDC, to delay, to a date not to exceed October 15, 2026, removing specific vessels or individuals from the anchorage when additional services or resources are necessary to protect the health and safety of vessel occupants.  Otherwise, the time periods set forth above for removal of occupied vessels shall be extended only for good cause.  For purposes of this agreement, good cause may include (1) local, state, or federal orders related to pandemics or emergencies that preclude RBRA from implementing this agreement; (2) the issuance of any court order precluding the RBRA from complying with the terms of this agreement; and (3) any other factor outside RBRA's control that RBRA and BCDC agree could not have been reasonably foreseen at the time this agreement was signed.

13. **Commitment to Cooperation in Actions that Promote a Regional Solution to Issues Surrounding Unauthorized Vessels in Richardson Bay.** The RBRA shall:

    a. Participate in regional efforts to address unauthorized vessels and identify housing alternatives for occupants of anchor-out vessels.

    b. Continue to connect persons living on vessels with outreach agencies and organizations that provide assistance with finding upland housing.

    c. Encourage expansion of housing opportunities consistent with the policies laid out in the RBRA's Transition Plan.

14. **Waiver.**  The failure of a Party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver nor shall it deprive such party of the right to insist upon strict adherence to that term or any other term of this Agreement.  Any waiver must be in writing signed by the waiving Party.

15. **Reporting Requirements.** In addition to any reporting requirement specified above, RBRA will provide the following reports to BCDC:

a. **Monthly reports**, provided to BCDC staff by the 12th of each month, discussing:
    i. **Vessel metrics.** The number, type, category, and condition of registered and unregistered vessels entering, leaving, and currently anchoring in Richardson Bay; the number of anchoring permits RBRA has issued and any permits not adhered to; the number of moorings installed and their use; the amount of ground tackle/moorings removed or left behind and how this complies with CEMP; and the number of vessels removed or moved pursuant to this agreement by category.
    ii. **Eelgrass metrics.** Progress and results from restoration studies in the Eelgrass Protection Zone; progress on completing and implementing the 10-year adaptive management plan and how it meets the minimum requirements of the CEMP (including goals, performance standards, monitoring performance milestones, and contingency plans); findings on effectiveness of temporary moorings and their removal; new subtidal habitat damage and the RBRA's response.
    iii. **Housing metrics.** No monthly reporting requirements.
    iv. **Governance metrics.** BCDC's long term expectation is that the anchorage will be available to seaworthy, self-propelled vessels subject to periodic inspection. As the RBRA works towards meeting this long-term expectation the following information will be included in its governance metrics. Progress implementing the no-anchoring zone; the number of illegal anchor outs in the no-anchoring zone and in Richardson Bay; Efforts to reduce the number of illegal anchor-outs and their effectiveness; The number of vessels attempting to anchor in the no-anchoring zone; RBRA's cooperative efforts to address illegal anchor-outs and eelgrass restoration; Any changes in RBRA membership, staffing, or funding; any water quality monitoring results; Any debris and flotsam clean-up data; and any anticipated requests for extension of time.

b. **Quarterly reports,** provided to BCDC's Enforcement Committee. RBRA staff commits to attend the Committee meeting and address any questions regarding the reporting. Quarterly reports will discuss all the above reporting requirements, and:
    i. **Vessel metrics.** RBRA's efforts to prevent importation of derelict vessels into Richardson Bay; whether RBRA is on pace to meet the obligations of this agreement.
    ii. **Eelgrass metrics.** RBRA's acquisition of restoration funds and how RBRA will address projected budget surplus and/or deficits; progress on the beneficial reuse of dredged materials; effectiveness of eelgrass restoration planning and implementation.
    iii. **Housing metrics.** As described in Section 8.
    iv. **Governance metrics**. As above.

   c. **Annual Reports**, provided to the BCDC Commission.  RBRA staff commits to attend the Commission meeting and address any questions regarding the reporting.  The annual report will summarize the results of the monthly and quarterly reports, and RBRA's progress towards implementing this agreement by the October 15, 2026 deadline for the removal of all illegally anchored vessels.

16. **Reservation of Rights**. The Executive Director and the Commission reserve the right to take appropriate enforcement action in the event of any failure by the RBRA to comply with the terms of this Agreement. No less than 30 days prior to issuing a Violation Report regarding compliance with this Agreement, BCDC will give written notice to the RBRA or, as appropriate, Marin County or the other member agencies, of such failure under the Agreement and the Parties will meet informally in an effort to resolve the issue without the necessity of commencing a formal enforcement action.

17. **Authority**. Each Party has the full and complete authority to execute this Agreement as set forth below. The Parties further warrant and represent that the individuals executing and delivering this Agreement have the full and complete authority and capacity to execute this Agreement.

18. **Mutual Release**.  Execution and delivery of this Agreement and implementation of the terms herein constitutes a full and complete satisfaction of all claims and demands by BCDC against RBRA related to the failure to prevent Bay fill through permanent houseboats and anchor-out vessels through October 15, 2026. BCDC hereby agrees not to pursue additional enforcement related to this failure through October 15, 2026.

19. **No Admission of Liability.**  This Agreement does not constitute an admission by RBRA of any violation of federal, state, or local law, ordinance or regulation or of any violation of RBRA's policies, procedures or ordinances, or of any liability or wrongdoing whatsoever. Neither this Agreement nor anything in this Agreement shall be construed to be or shall be admissible in any proceeding as evidence of liability or wrongdoing by RBRA. Nothing in this agreement constitutes mitigation required because of RBRA acts or omissions.  BCDC agrees to provide letters of support for any grant applications RBRA submits to fund activities specified in this Agreement stating that this Agreement does not constitute legally required mitigation for RBRA's acts or omissions.  This Agreement may be introduced, however, in any proceeding to enforce the Agreement.

20. **Governing Law.** This Agreement shall be governed by, interpreted, and construed in accordance with the laws of the State of California.

21. **Effective Date.** This Agreement is effective on the date it is signed by the representatives authorized to sign for the Parties.

8

| | |
|---|---|
| Richardson's Bay Regional Agency | San Francisco Bay Conservation And Development Commission |
| _____ | _____ |
| Stephanie Mouton-Peters, Board Chair | Lawrence J. Goldzband, Executive Director |

Attachments:
- Transition Plan for the Richardson's Bay Regional Agency Anchorage
- Ecologically-based Mooring Feasibility Assessment and Planning Study by Merkel & Associates
- Draft Eelgrass Protection and Management Plan
- Photo image of each floating home and aerial image of their locations
- Current California Eelgrass Mitigation Policy and its Implementing Guidelines